___

**SO ORDERED,**

*/s/ Neil P. Olack*

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: March 18, 2019**

**The Order of the Court is set forth below. The docket reflects the date entered.**
___

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

**IN RE:**

**ALEXANDER SEAWRIGHT**                      **CASE NO. 19-00217-NPO**
**TRANSPORTATION, LLC,**

   **DEBTOR.**                                                                       **CHAPTER 11**

**MEMORANDUM OPINION AND ORDER**
**DENYING EMERGENCY MOTION FOR IMPOSITION OF**
**THE AUTOMATIC STAY, FOR DAMAGES, SANCTIONS AND FOR CONTEMPT**

This matter came before the Court for hearing on March 1, 2019 (the "Hearing"), on the Emergency Motion for Imposition of the Automatic Stay, for Damages, Sanctions and for Contempt (the "Emergency Motion") (Dkt. 76) filed by the debtor, Alexander Seawright Transportation, LLC (the "Debtor"); the Response to Debtor's Emergency Motion for Imposition of the Automatic Stay, for Damages, Sanctions and for Contempt (the "Premco Response") (Dkt. 93) filed by Premco Financial Corporation, Inc. ("Premco"); the Response to Emergency Motion for Imposition of the Automatic Stay, for Damages, Sanctions and for Contempt (the "Southern Response") (Dkt. 95) filed by Southern Insurance Specialist, Corp. ("Southern"); the First Light Program Managers, Inc.'s Preliminary Response and Objection to Debtor's Emergency Motion for Imposition of the Automatic Stay and Other Relief (the "First Light Response") (Dkt. 98) filed by First Light Program Managers, Inc. ("First Light"); and the First Light Program Managers's

Page 1 of 14

Supplemental Response and Objection to Debtor's Emergency Motion for Imposition of the Automatic Stay, for Damages, Sanctions and for Contempt (the "First Light Supplemental Response") (Dkt. 110) filed by First Light in the above-referenced bankruptcy case (the "Bankruptcy Case"). Additionally, there came before the Court for a status conference on March 1, 2019, the Motion for Abandonment and Relief from Automatic Stay, or, Alternatively, for Adequate Protection, with Respect to Premium Financing Contracts (the "Premco Motion") (Dkt. 63) filed by Premco in the Bankruptcy Case. At the Hearing, Craig M. Geno represented the Debtor; Jeffrey Ryan Barber represented Premco; William W. Busching represented Southern; and William H. Leech and Sarah Elizabeth Wilson represented First Light. During the Hearing, the Debtor introduced into evidence two (2) exhibits; Southern introduced into evidence two (2) exhibits; and First Light introduced into evidence three (3) exhibits.[1] The Debtor presented the testimony of one (1) witness: Timothy Savell ("Savell"), the Operations Manager of the Debtor,[2] and Southern presented the testimony of one (1) witness: Peter F. Keyes ("Keyes"), the owner of Southern.[3] First Light did not present any witnesses at the Hearing. The Court ruled from the bench at the Hearing, and this Opinion memorializes and supplements the Court's bench ruling.[4]

---

[1] Hereinafter, exhibits introduced into evidence at the Hearing by the Debtor are cited as "(Debtor Ex. __)"; exhibits introduced into evidence at the Hearing by Southern are cited as "(Southern Ex. __)"; and exhibits introduced into evidence at the Hearing by First Light are cited as "(First Light Ex. __)".

[2] Test. of Savell at 2:00:22 – 2:00:50. The Hearing was not transcribed. References to the argument and testimony presented at the Hearing are cited by the timestamp of the audio recording.

[3] *See* SOUTHERN INSURANCE SPECIALIST CORP., http://www.southern-ins.com/contact.asp (last visited Mar. 13, 2019).

[4] The Court makes the following findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**Jurisdiction**

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) and (O). Notice of the Hearing was proper under the circumstances.

**Facts**

1. On January 4, 2019, the Debtor's physical damage insurance policy and the Debtor's cargo insurance policy (the "2018 Policies") were cancelled due to non-payment of the monthly premiums.[5]

2. On January 18, 2019, at approximately 9:30 a.m., Savell arrived at Keyes' office at Southern to begin the process of obtaining physical damage insurance and cargo insurance for the Debtor (the "Prepetition Meeting"). Savell claims that he left Keyes' office at approximately 10:00 a.m. after completing an insurance application and with the understanding that the Debtor had physical damage insurance coverage[6] and cargo insurance coverage.[7] Nothing in the record suggests that Savell, or anyone else, disclosed to Keyes that the Debtor intended to file the Voluntary Petition for Non-Individuals Filing for Bankruptcy (the "Petition") under chapter 11 of the United States Bankruptcy Code (the "Code") less than one (1) hour after the Prepetition Meeting.

3. On January 18, 2019, at 11:13 a.m., the Debtor filed the Petition. (Dkt. 1).

---

[5] 2:33:49 – 2:34:00.

[6] At the Hearing, counsel for the Debtor argued that an oral contract for physical damage insurance coverage existed after the Prepetition Meeting.

[7] Test. of Savell at 3:50:40 – 3:51:42.

4.      Jon Seawright ("Seawright") is the manager of the Debtor[8] (Dkt. 1) and a licensed practicing attorney and shareholder in the Jackson, Mississippi office of a law firm with over 700 attorneys.  On January 18, 2019, at 3:30 p.m., Seawright emailed Keyes a signed copy of the Insurance Proposal for Alexander Sewright [*sic*] Transportation (the "Insurance Proposal"), which contains information regarding the Debtor's physical damage insurance coverage with Certain Underwriters at Lloyd's of London ("Lloyd's"); information regarding the Debtor's cargo insurance coverage with Aspen American Insurance Company ("Aspen"); a request for insurance coverage to be bound; a payment agreement between the Debtor and Southern (the "Payment Agreement"); and the Insurance Premium Finance Contract and Disclosure Statement (the "Financing Agreement") between the Debtor and Premco.  (Southern Ex. 1).  Nothing in the record suggests that Seawright, Savell, or anyone else on behalf of the Debtor, disclosed to Premco, Southern, or First Light that the Debtor had filed the Petition approximately (4) hours earlier.

5.      On January 18, 2019, Southern issued to the Debtor the Certificate of Liability Insurance, evidencing physical damage insurance coverage (Policy No. MSAPD18076) (the "Physical Damage Insurance Policy") and cargo insurance coverage (Policy No. IM00AF219) (the "Cargo Insurance Policy") (collectively, the "2019 Policies") effective as of "1/18/2019" and expiring on "1/18/2020."  (Debtor Ex. 1).

6.      On February 15, 2019, First Light, on behalf of Lloyd's, issued to the Debtor the Notice of Cancellation (the "Cancellation Notice"), notifying the Debtor that its physical damage insurance coverage would terminate on "3/2/2019 Hour Standard Time: 12:01 AM" due to "nonpayment of premium."  (Debtor Ex. 2).

---

[8] Seawright did not attend the Hearing.

7. On February 22, 2019, the Debtor filed the Emergency Motion, asserting that the 2019 Policies were in effect prepetition and, thus, the Court should enforce the automatic stay and reinstate the Physical Damage Insurance Policy.

8. On February 28, 2019, Premco filed the Premco Response, asserting that it should be allowed to respond to the Emergency Motion and to participate in the Hearing because of "its role in the process of financing the insurance premiums." (Dkt. 93). The Court will address Premco's concerns regarding the 2019 Policies when it considers the Premco Motion on March 19, 2019.

9. On February 28, 2019, Southern filed the Southern Response, asserting that the automatic stay provisions are inapplicable because the Debtor applied for the Physical Damage Insurance Policy and signed the Financing Agreement postpetition. Southern further asserted that Premco "forwarded the financed funds for the Debtor's [2019 Policies] to [Southern], to be held in trust, until such time as the contractual conditions had been met." (Dkt. 95). Once the Debtor satisfied its contractual conditions, "[Southern] would send the funds [to] the insurance carrier." (*Id.*) The Debtor did not satisfy its contractual conditions, and pursuant to the terms of The Schedule (the "Physical Damage Insurance Agreement") (First Light Ex. 2), First Light sent the Cancellation Notice to the Debtor. Premco then informed Southern that the Debtor failed to disclose its financial condition upon signing the Financing Agreement. To date, Southern "is holding, in trust, the funds financed by Premco for payment of the Debtor's premiums and will continue to hold said funds until the Court directs it to do otherwise." (Dkt. 95) Southern further asserts that the Debtor is in violation of Rule 4001(c) of the Federal Rules of Bankruptcy Procedure ("Rule 4001(c)") "by entering into post-petition financing without obtaining this Court's

[a]pproval." Finally, Southern asserts that the Debtor has acted in bad faith by "obtain[ing] credit without the statutorily required approval and without the required notice to creditors." (*Id.*)

10.     On February 28, 2019, First Light filed the First Light Response, asserting that the Court should deny the Emergency Motion because the Debtor obtained the Physical Damage Insurance Policy postpetition "without approval of this Court and without First Light's knowledge of the filing of [the Petition]." (Dkt. 98). Thus, "the automatic stay was not in effect, or in the alternative, First Light is entitled to relief from the automatic stay." (*Id.*)

11.     On March 1, 2019, First Light filed the First Light Supplemental Response, asserting that the 2019 Policies are "void *ab initio*, and that the Debtor did not have any contractual rights that are or should be protected by the automatic stay." Alternatively, the Cancellation Notice does not violate the automatic stay "because insurance policies cannot be rewritten to prevent the termination of a contract by their own terms." (Dkt. 110).

## Discussion

As a preliminary matter, the Court finds that it would be helpful to provide a brief discussion of the relationship between the parties involved in the Hearing. The Debtor is a trucking company. Southern serves as an insurance agent for trucking companies. Acting as the Debtor's insurance agent, Southern negotiated for and obtained physical damage insurance coverage through Lloyd's and cargo insurance coverage through Aspen. First Light operates as a coverholder for Lloyd's; it bound the Physical Damage Insurance Policy, and it has the authority, *inter alia*, to collect premiums and to issue a notice of cancellation when the insured fails to make a payment. Premco, an insurance premium finance company, provided financing for the Debtor's premium payments on the 2019 Policies. In accordance with the Financing Agreement, Premco

advanced money to Southern to be held in trust until the premium payments on the 2019 Policies become due and are forwarded to Lloyd's and Aspen.

The Court scheduled the Hearing to resolve the Emergency Motion before the termination of the Property Damage Insurance Policy on March 2, 2019 at 12:01 a.m., pursuant to the Cancellation Notice. Without property damage insurance coverage, the Debtor would be unable to operate its tractors and trailers in interstate commence. The main issue at the Hearing was whether the Physical Damage Insurance Agreement constitutes a prepetition, executory contract[9] and, thus, is subject to the protections of the automatic stay under 11 U.S.C. § 362.[10] At the Hearing, the Debtor argued that it obtained the Physical Damage Insurance Agreement prepetition, and Premco, Southern, and First Light argued that the Debtor obtained the Physical Damage Insurance Agreement postpetition and without permission from this Court as required by Rule 4001(c).

In support of the Physical Damage Insurance Agreement constituting a prepetition agreement, Savell testified that the Debtor has an ongoing four-year relationship with Southern and that Southern is the Debtor's primary insurance broker. On January 18, 2019, at approximately 9:30 a.m., Savell met with Keyes at Southern to discuss the status of the Debtor's physical damage insurance coverage and cargo insurance coverage. Savell testified that, while at Southern, he completed the Automobile Physical Damage Insurance Commercial Vehicles Proposal Form (First Light Ex. 3) and that he signed it on behalf of the Debtor as the "Applicant" in the signature block

---

[9] The Court notes that the Debtor did not list the Physical Damage Insurance Agreement as an executory contract on Schedule G: Executory Contracts and Unexpired Leases. (Dkt. 65 at 16-17).

[10] Hereinafter, all code sections refer to the Code found at title 11 of the U.S. Code, unless otherwise noted.

of the document. Savell left Southern at approximately 10:30 a.m., with "firm convictions" that the Debtor had both physical damage insurance coverage and cargo insurance coverage.[11] When asked why he believed the Debtor had both physical damage insurance coverage and cargo insurance coverage at this time, Savell testified that, before he left Southern, he asked Keyes if "we are good," and Keyes purportedly told Savell "we are good."[12] Relying on this exchange, the Debtor commenced the Bankruptcy Case at 11:13 a.m., less than one (1) hour later.

Ultimately, the Debtor obtained physical damage insurance coverage through Lloyd's and cargo insurance coverage through Aspen. (Debtor Ex. 1). The 2019 Policies reflect an effective date of January 18, 2019, and an expiration date of January 18, 2020. (*Id.*) Since the 2019 Policies provide only an effective date, and no effective "time," the Debtor argued at the Hearing that the 2019 Policies were in effect throughout the entire day of January 18, 2019. Additionally, the Debtor argued that the 2019 Policies also were in effect postpetition when the Debtor advised its creditors of the commencement of the Bankruptcy Case. Thus, according to the Debtor, Lloyd's and/or First Light, on behalf of Lloyd's, violated the automatic stay by issuing on February 15, 2019, the Cancellation Notice, which provided that the Debtor's physical damage insurance coverage would terminate on "3/2/2019 Hour Standard Time: 12:01 AM" due to nonpayment of premium. (Debtor Ex. 2). The Debtor asks this Court to enforce the automatic stay and to reinstate the Physical Damage Insurance Policy.

In support of the Physical Damage Insurance Agreement constituting a postpetition agreement, Keyes testified that he must receive a quote from an insurance company before Southern can bind an insurance policy. Keyes received the quote for the Physical Damage

---

[11] Test. of Savell at 03:50:08 – 03:50:30.

[12] Test. of Savell at 03:50:40 – 03:51:30.

Insurance Policy from First Light, on behalf of Lloyd's, at 1:50 p.m. on January 18, 2019. (Southern Ex. 2). After Keyes received the quote from First Light, he compiled the Insurance Proposal and presented it to the Debtor. More specifically, Keyes sent the Insurance Proposal to Savell after 1:50 p.m. on January 18, 2019, Savell forwarded the Insurance Proposal to Seawright, Seawright signed the Insurance Proposal, and Seawright emailed the signed copy of the Insurance Proposal to Keyes at 3:30 p.m. on January 18, 2019. (Southern Ex. 1). Keyes testified that insurance carriers "cannot bind coverage without signed apps."[13] At 3:52 p.m. on January 18, 2019, Southern emailed the signed copy of the Insurance Proposal to First Light. (Southern Ex. 2). In response, First Light requested that Southern confirm its request to bind the Physical Damage Insurance Policy. (*Id.*) Southern responded to First Light in the affirmative and requested that it "[p]lease bind coverage effective 1/18/2019."[14] (*Id.*) At 4:02 p.m. on January 18, 2019, Southern received from First Light the Binder for the Physical Damage Insurance Policy.[15] (First Light Ex. 1). Subsequently, First Light sent to Southern the Physical Damage Insurance Agreement, which provides that the period of insurance begins on January 18, 2019, and ends on January 18, 2020, at "12:01 a.m. Local Standard Time at the address of the Assured shown above."[16] (First Light Ex. 2). When asked if the Physical Damage Insurance Policy would have covered a claim made after 12:01 a.m. on January 18, 2019, Keyes testified that claims are covered

---

[13] Test. of Keyes at 2:53:32 – 2:53:34.

[14] Test. of Keyes at 2:57:32 – 2:58:12.

[15] Test. of Keyes at 2:58:15 – 2:58:33.

[16] With respect to the Cargo Insurance Policy, Keyes testified that Southern received confirmation that the Cargo Insurance Policy was bound prepetition at approximately 9:40 a.m. on January 18, 2019. Test. of Keyes at 3:14:35 – 3:15:37. This Opinion does not address any potential issues arising out of or the validity of the Cargo Insurance Policy.

only after the polices are bound. Before receiving a quote for insurance coverage, Lloyd's required the Debtor to sign a "no loss letter" for the period of January 4, 2019, through January 18, 2019. Keyes also testified, however, that all policies go into "effect" at 12:01 a.m. on the day of binding.[17] Finally, the Physical Damage Insurance Agreement provides that "[i]f the Assured has concealed or misrepresented any material fact or circumstance concerning this Insurance, or if the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Insurance shall become void and all claim hereunder shall be forfeited." (*Id.* ¶ 15). The Physical Damage Insurance Policy "may also be cancelled by or on behalf of [Lloyd's] . . . for non payment of premium." (*Id.* ¶ 14).

To finance the 2019 Policies, Seawright, on behalf of the Debtor, signed and submitted to Southern, approximately four (4) hours after filing the Petition, the Financing Agreement between Premco and the Debtor, which provides that the Debtor shall pay to Premco ten (10) monthly payments of $8,652.54 and a down payment to Southern in the amount of $20,437.44 (the "Down Payment"), for a total amount of $106,962.84. (Southern Ex. 1). Paragraph 7 of the Financing Agreement further provides that "INSURED confirms that there are no pending or anticipated bankruptcy, receivership or insolvency proceedings involving the INSURED, and there are no known or anticipated circumstances which will impair INSURED ability to fulfill its obligations under this contract." (*Id.*) Additionally, pursuant to the Payment Agreement between Southern and the Debtor, contained in the Insurance Proposal, the Debtor and Seawright, individually, promised to pay to Southern "a weekly installment of $2,000 beginning the week of January 28, 2019, until such balance is paid-in-full." (*Id.*) Keyes testified that the Debtor owed Southern approximately $15,000.00 for the 2018 Policies and approximately $20,000.00 as a down payment

---

[17] Test. of Keyes at 3:18:35 – 3:19:13.

for the 2019 Policies. While Savell, on behalf of the Debtor, made a payment to Southern in the amount of $8,000.00 on January 18, 2019, the Payment Agreement governs the remaining amounts owed to Southern for the 2018 Policies and the 2019 Policies.[18] Keyes further testified that Southern applied the $8,000.00 payment toward the Debtor's balance for the 2018 Policies, and the Debtor has not made any payments to Southern since signing the Payment Agreement. Since the Debtor failed to pay to Southern the Down Payment "due at signing" and failed to make a premium payment to Lloyd's, through First Light, the Debtor defaulted under the Financing Agreement and the Physical Damage Insurance Agreement. Accordingly, First Light issued the Cancellation Notice, advising that the Physical Damage Insurance Policy would terminate for "nonpayment of premium" at 12:01 a.m. on March 2, 2019. (Debtor Ex. 2). Premco, Southern, and First Light asked this Court to deny the Emergency Motion because the Debtor acted in bad faith by: (1) misrepresenting its financial condition on January 18, 2019; (2) neglecting to inform Premco, Southern, or First Light that it was planning to file for bankruptcy relief or, in fact, already had filed for bankruptcy relief on January 18, 2019; and (3) failing to obtain approval from this Court pursuant to Rule 4001(c) to acquire the Physical Damage Insurance Policy after filing the Petition.

After fully considering the matter, the Court found at the Hearing that the Emergency Motion should be denied. The Physical Damage Insurance Agreement provides that the period of insurance begins on January 18, 2019, and ends on January 18, 2020, at "12:01 a.m. Local Standard Time at the address of the Assured shown above." (First Light Ex. 2). While Keyes testified that the 2019 Policies became effective at 12:01 a.m. on January 18, 2019, Keyes also testified that claims are covered only after policies are bound, and the Physical Damage Insurance Policy was

---

[18] Test. of Keyes at 2:19:57 – 2:20:35.

bound postpetition. The issue of whether a claim is covered under the 2019 Policies, however, is not before this Court. At best, the Court finds that the coverage period is ambiguous.

At the Hearing, counsel for the Debtor argued that ambiguous terms in insurance contracts should be construed against the drafter. The doctrine of *contra proferentem* "is often applied in the context of insurance contracts: '[W]hen plan terms remain ambiguous after applying ordinary principles of contract interpretation, courts are to construe them strictly in favor of the insured.'" *Kirschenheuter v. Bd. of Trs. of the GSC-ILA Pension Plan & Tr.*, 341 F. Supp. 2d 624, 631 (S.D. Miss. 2004) (quoting *Nationalcare Corp. v. St. Paul Prop. & Cas. Ins. Co.*, 22 F. Supp. 2d 558, 565, n.11 (S.D. Miss. 1998)). While the Physical Damage Insurance Agreement provides only a date for when the Physical Damage Insurance Policy takes effect, it provides both a date and time for when the Physical Damage Insurance Policy expires. If Lloyd's intended to limit the Physical Damage Insurance Policy's effective date to the time of binding, it could have done so in the Physical Damage Insurance Agreement, according to the Debtor.

Alternatively, the record reflects undeniably that Seawright, on behalf of the Debtor, signed the Financing Agreement postpetition and obtained financing for the 2019 Policies after failing to disclose the Debtor's financial condition and financial status. As discussed earlier, the Financing Agreement required the Debtor to confirm "that there are no pending or anticipated bankruptcy, receivership or insolvency proceedings involving the INSURED, and there are no known or anticipated circumstances which will impair INSURED ability to fulfill its obligations under this contract." (Southern Ex. 1). Despite this condition, Seawright signed the Financing Agreement with the understanding that the Debtor had filed the Petition approximately four (4) hours beforehand. The Debtor's distressed financial condition at the time of signing is further evidenced by the fact that the Debtor never made a payment under the Financing Agreement.

While the Court can weigh the evidence presented at the Hearing and analyze whether the Debtor obtained the Physical Damage Insurance Policy prepetition or postpetition, this Court refuses to assist the Debtor with its obvious omission of facts to Premco, Southern, and First Light. Seawright is a licensed practicing attorney and a shareholder in a large law firm. The Court finds that Seawright, as an attorney, should be more familiar than other debtors with legal documents and the consequences of failing to disclose material facts to an insurance company and its affiliates. Indeed, Savell and Seawright secured insurance coverage vital to the Debtor's business fully knowing that the Debtor would be filing soon or, in fact, already had filed the Petition. Nothing in the record suggests that Savell, Seawright, or anyone else on behalf of the Debtor disclosed to Premco, Southern, or First Light that the Debtor intended to file the Petition less than one (1) hour after the Prepetition Meeting or that it had filed the Petition before signing the Financing Agreement, the Payment Agreement, and the Insurance Proposal.

Even if the Physical Damage Insurance Agreement is a prepetition agreement, the Court will not grant the Emergency Motion and enforce the automatic stay to ensure that the Debtor's scheme succeeds. "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir. 1986). The "[r]equirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is . . . to achieve reprehensible purposes." *Id.* at 1072. Additionally, "a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons [such as the enforcement of the automatic stay] available only to those debtors and creditors with 'clean hands.'" *Id.* Since the Emergency Motion requests this Court to validate the 2019 Polices that the Debtor obtained

by deception, this Court finds that the Debtor filed the Emergency Motion in bad faith.[19]  As a result, the Cancellation Notice is valid and does not violate the automatic stay.  To the extent required, the Court finds that the automatic stay should be annulled retroactive to February 15, 2019, the date of the Cancellation Notice.

## Conclusion

For the above and foregoing reasons, the Court finds that the Emergency Motion should be denied and that the automatic stay should be annulled retroactive to the date of the Cancellation Notice to the extent necessary under § 362.  To the extent the Court has not addressed any of the parties' other arguments or positions, it has considered them and determined they would not alter the result.

IT IS, THEREFORE, ORDERED that the Emergency Motion is hereby denied.

IT IS FURTHER ORDERED that the automatic stay is annulled retroactive to February 15, 2019, if necessary.

##END OF OPINION##

---

[19] The Debtor also asserted, apparently recognizing the weakness in its argument based upon the actual insurance and financing documents, that somehow an oral contract existed for physical damage insurance coverage after the alleged communication exchange between Savell and Keyes at the Prepetition Meeting.  To the extent this alleged communication created a prepetition oral contract, the Court finds that the Debtor entered it in bad faith.  As a result, the oral contract would be unenforceable.